IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>vs.<br><br>RANDALL SHADY,<br><br>          Defendant. | Case No. CR11-1010<br><br>REPORT AND<br>RECOMMENDATION |

TABLE OF CONTENTS

I.    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   *PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  *ISSUE PRESENTED* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.  *RELEVANT FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

V.    *DISCUSSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      A.    *Did Hubbard Have Actual Authority?* . . . . . . . . . . . . . . . . . . . 5
      B.    *Did Hubbard Have Apparent Authority?* . . . . . . . . . . . . . . . . . 6
           1.   *Hubbard's Lack of Keys and Window Entry* . . . . . . . . . . . . 6
           2.   *Other Indicia of Apparent Authority* . . . . . . . . . . . . . . . . . 7

VI.  *SUMMARY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

VII. *RECOMMENDATION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## I. INTRODUCTION

On the 12th day of January, 2012, this matter came on for hearing on the Motion to Suppress (docket number 18) filed by the Defendant on January 3, 2012. The Government filed its Resistance (docket number 31) on January 11, 2012. The Government was represented by Special Assistant United States Attorney Anthony R. Morfitt. Defendant Randall Shady appeared in person and was represented by his attorney, Jill M. Johnston.

## II. PROCEDURAL HISTORY

On December 6, 2011, Defendant Randall Shady was charged by Indictment with conspiring to manufacture methamphetamine (Count 1), and possession of pseudoephedrine (Count 2). At the arraignment on December 15, 2011, Defendant entered a plea of not guilty and trial was scheduled for February 13, 2012. On January 3, 2012, Defendant timely filed the instant motion to suppress. At the suppression hearing held on January 12, 2012, both parties agreed the trial could not proceed as scheduled due to the pendency of the instant motion. Therefore the trial was rescheduled for February 27, 2012.

## III. ISSUE PRESENTED

In his motion to suppress, Defendant asserts that a warrantless search of his residence violated his Fourth Amendment rights. Defendant asks that the Court suppress "all evidence seized" during the execution of a search warrant obtained using information resulting from the initial warrantless search.

## IV. RELEVANT FACTS

In the early morning hours of September 1, 2011, Ashley Hubbard went to the Maquoketa Law Center and reported Defendant had assaulted her. In response, officers went to Defendant's residence in Maquoketa, Iowa, but Defendant was not there at that time. Just a few hours later, at 8:50 a.m., Defendant's neighbor called 911 upon hearing Hubbard's pleas for someone to call the police. Patrick Fier, a patrolman for the Maquoketa Police Department, responded to Defendant's residence. The address is a

double-wide trailer featuring a door on both the front (south) and back (north) side. Fier found Hubbard on the steps of the neighbor's residence, crying with an abrasion on one side of her face and bleeding from the eye/nose area.

Hubbard told Officer Fier that she returned to Defendant's residence that morning to retrieve some belongings, believing Defendant had been arrested the night before and would not be there. She explained that she had made two or three trips into the trailer, removing items in white grocery bags to the sidewalk outside, when Defendant woke up, prevented her from leaving the trailer, and assaulted her. According to Hubbard, Defendant then carried the bags of Hubbard's belongings, which she had previously placed outside, back into the trailer. At some point after Hubbard talked to police, Defendant exited the residence and locked the rear door. Defendant was then arrested on suspicion of assault and taken to jail. The officers did not ask Defendant any questions regarding ownership of the trailer, or if he or Hubbard lived at the trailer.

Meanwhile, the officers requested an ambulance to treat Hubbard for her injuries. Before being transported, officers asked Hubbard if she would like to retrieve any of her personal effects from the trailer. By that point, Hubbard had told officers she lived in the trailer, although she did not stay there that night, after the earlier altercation. After Hubbard said she would like to obtain her belongings, the officers found that both doors were locked and Hubbard did not have a key.[1] Hubbard recalled, however, that the window to the right of the front door remained unlocked.[2] The officers helped her climb into the trailer through the unlocked window. Once inside, Hubbard unlocked the front door and let the officers enter the trailer.

---

[1] The record does not indicate whether she ever had a key.

[2] Officer Fier did not include this detail in his incident report, although it was discussed in his testimony.

As Hubbard began retrieving from the bedroom the four to six grocery bags of belongings – including clothes, a blow dryer, and personal hygiene items – Officer Fier stood in the bedroom and could see inside an adjacent, open bathroom. Fier observed several "generators," which appeared to be related to the manufacture of methamphetamine. Fier asked Hubbard if he could take a closer look, and she said that he could. In the open cupboard underneath the sink and in a closet, Fier saw more items consistent with the manufacture of methamphetamine. Hubbard told the officers that Defendant manufactured methamphetamine in the trailer and had more items in the garage.

Based on these observations and Hubbard's statement, officers then applied for a search warrant. The execution of the search warrant yielded additional items indicative of the manufacture of methamphetamine. Police also found an empty box of pseudoephedrine bearing Hubbard's name.

Weeks after the incident and the execution of the search warrant, officers learned that Hubbard was married to someone else, who had an address different from Defendant's residence. Also at that time, however, officers were told by Hubbard that she had lived at Defendant's residence since March 2010.

## V. DISCUSSION

In support of his motion to suppress, Defendant makes two related arguments. First, he argues that Hubbard lacked proper authority to give law enforcement consent to enter and subsequently search his residence. Second, he argues that since the information used to obtain the search warrant was gained by an unlawful warrantless entry, the fruits of the subsequent search must be suppressed. The Government concedes that if the initial entry was unlawful, then the search warrant is invalid and the evidence seized is inadmissible. Thus, the issue turns upon whether the officers' initial entry into Defendant's home was violative of the Fourth Amendment.

The Fourth Amendment requires law enforcement officials to obtain a warrant to enter an individual's home, unless an established exception to the warrant requirement

exists. *United States v. Riedesel*, 987 F.2d 1383, 1388 (8th Cir. 1993). Consent is a valid exception to the warrant requirement and may be obtained from the suspect or another person who has common authority over, or a sufficient relationship to, the premises to be searched. *United States v. Amratiel*, 622 F.3d 914, 916 (8th Cir. 2010) (citing *United States v. Matlock*, 415 U.S. 164, 171 (1974)). The Government bears the burden of proving that an exception to the warrant requirement exists. *United States v. Almeida-Perez*, 549 F.3d 1162, 1169 (8th Cir. 2008) (citation omitted).

### A. Did Hubbard Have Actual Authority?

Defendant does not dispute that Hubbard gave consent, but rather argues Hubbard did not have the requisite 'common authority' over the premises. Common authority, or "actual authority," depends upon mutual use of the property by persons generally having joint access or control for most purposes. *Matlock*, 415 U.S. at 171 n.7. The Eighth Circuit Court of Appeals has found common authority in spouses, *Amratiel*, 622 F.3d at 916, adult co-tenants, *United States v. Jones*, 193 F.3d 948, 950 (8th Cir. 1999), and live-in girlfriends with unrestricted access to the house, *United States v. Nichols,* 574 F.3d 633, 636 (8th Cir. 2009).

Here, Hubbard is not Defendant's spouse nor does she have legal title in Defendant's residence. The exact nature of the living arrangement understood between Defendant and Hubbard is unknown. Hubbard told officers that she had lived at the residence since March 2010, but she did not testify at the hearing. It is likely that 18 months of living with Defendant featured all of the privileges typical of cohabitation, which would thus enable Hubbard authority to consent. *See Matlock*, 415 U.S. at 171 n.7 ("[i]t is reasonable to recognize that any of the co-inhabitants has the right to permit inspection in his own right."). However, no evidence was presented at the hearing detailing the arrangement. Without proof regarding Hubbard's prior use of and access to the trailer, the Court is unable to find that she had common authority over the residence.

Thus, the Government has failed to meet its burden of proving her actual authority to consent to a search.

## B. Did Hubbard Have Apparent Authority?

In cases where a third party lacks actual authority, a warrantless entry is still lawful if police reasonably believed at the time of the entry that the consenting third party had actual authority over the premises; such belief in actual authority is known as "apparent authority." *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990). The test for determining whether a consenting third-party has apparent authority is whether "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Amratiel*, 622 F.3d at 916 (quoting *Rodriguez*, 497 U.S. at 188). Even if the third party makes an explicit assertion of living at a particular residence, officers must consider the surrounding circumstances that might render such assertion doubtful, thereby requiring further inquiry. *Rodriguez*, 497 U.S. at 188. However, police are not required to take affirmative steps to confirm the actual authority of a consenting third party whose authority was apparent. *See Georgia v. Randolph*, 547 U.S. 103, 122 (2006) (discussing *Rodriguez*). The Eighth Circuit has been "more liberal about allowing police to form their impressions from context." *Almeida-Perez*, 549 F.3d at 1171.

### 1. Hubbard's Lack of Keys and Window Entry

Here, the officers relied on Hubbard's assertion that she lived at the residence. To undermine the officers' reasonable belief in Hubbard's apparent authority, Defendant highlights the fact that she did not have a key when the police were called to the scene, and "had to crawl through a window" to let the officers into the trailer. Defendant argues this fact shows a lack of mutual use, access, and control; which should have made the officers suspicious. The lack of a key is not dispositive, however, to the issue, *Amratiel*, 622 F.3d 914, 916 (8th Cir. 2010) (citing *United States v. Iron Wing*, 34 F.3d 662, 665 (8th Cir. 1994)), but instead remains only an indicator of apparent authority, *United States v.*

*McGee*, 564 F.3d 136, 141 (2d Cir. 2009). Ordinarily, Hubbard's lack of a key would appear unusual and cast doubt upon her authority. However, the chaos of a domestic abuse dispute often implies a reasonable explanation for missing house keys and does not compel further inquiry by the police. *See United States v. Penney*, 576 F.3d 297, 308 (8th Cir. 2009) (finding the lack of a key did not indicate lack of access or control because "[girlfriend] did not have a chance to even collect her shoes, let alone pick up a key"). In *Iron Wing,* the Eighth Circuit found apparent authority in the defendant's sister-in-law who, parallel to the instant case, claimed residency and climbed in through a window. 34 F.3d at 665. Hubbard's romantic relationship with Defendant would seem to be a stronger basis to believe apparent authority existed, than a sister-in-law relationship. Accordingly, the mere fact Hubbard did not have a key to the residence does not render the officers' belief in her statement – that she lived at the trailer – unreasonable.

### 2.    *Other Indicia of Apparent Authority*

The Eighth Circuit Court of Appeals has consistently found apparent authority over a defendant's residence when a romantically involved third party told police that he or she lived there, had belongings inside, and had familiarity with the interior. *See, e.g., Amratiel*, 622 F.3d at 916 (finding wife had apparent authority over locked gun safe because she knew how to access it, had possessions inside, and never claimed gun safe was exclusive to husband); *United States v. Nichols*, 574 F.3d 633, 636-37 (8th Cir. 2009) (finding apparent authority where cohabitant girlfriend kept possessions at the defendant's house, called and met police at the door, and "appeared familiar with the home"); *United States v. Hilliard*, 490 F.3d 635, 639 (8th Cir. 2007) (finding apparent authority where girlfriend invited officers into the defendant's home, picked up her personal items from the floor, and retrieved the defendant's hidden handgun); *United States v. Douglas*, 135 Fed. Appx. 4, 5-6 (8th Cir. 2005) (finding girlfriend had apparent authority where she invited officers into the defendant's apartment, claimed it was her primary residence over defendant's objections, had belongings there and revealed location of defendant's

handgun). Further, mere turbulence in the relationship does not automatically end such authority. *McGee*, 564 F.3d at 139-140; *Penney*, 576 F.3d at 308. *See also United States v. Ryerson*, 545 F.3d 483, 487-88 (7th Cir. 2005) (finding ex-wife had actual authority over the defendant's home despite moving elsewhere by time of the search, leaving many belongings behind); *United States v. Gillis*, 358 F.3d 386, 388-391 (6th Cir. 2004) (finding estranged girlfriend had apparent authority even after an altercation left her locked out of a house she no longer inhabited). The most recent Eighth Circuit case on the issue suggests that merely staying overnight may give rise to apparent authority. *See United States v. Rogers*, 661 F.3d 991, 994 (8th Cir. 2011) ("[W]e note during the course of Officer Puyear's investigation and encounter with Rogers, he learned Rogers had been staying overnight in the apartment with Ms. Spriggs. Thus, the officer could reasonably believe Rogers had authority to consent to an entry into the apartment.").

Furthermore, the facts available to the officers prior to the warrantless entry support their belief that Hubbard had authority. Most importantly, Hubbard told the police she lived with Defendant. She described in detail her efforts to retrieve personal effects still inside. Hubbard told the officers that Defendant had carried her belongings back into the residence after she had removed them to the sidewalk. This could reasonably suggest to the officers that Defendant recognized Hubbard's cohabitation of the trailer. Finally, Officer Fier testified that Hubbard's knowledge of an unlocked window was apparently not discovered through trial-and-error, as if she were a guest, but with the precise knowledge of a genuine resident. The Eighth Circuit has routinely upheld a finding of apparent authority under similar facts. *See Nichols*, 574 F.3d at 636-37 (finding apparent authority where cohabitant girlfriend kept possessions at defendant's house, called and met police at the door, and "appeared familiar with the home"); *Hilliard*, 490 F.3d at 639 (finding apparent authority where girlfriend invited officers into defendant's home, picked up her personal items from the floor, and retrieved defendant's hidden handgun); *Douglas*, 135 Fed. Appx. at 5-6 (finding girlfriend had apparent authority where she invited officers into

defendant's apartment, claimed it was her primary residence over defendant's objections, kept belongings there and revealed location of defendant's handgun). Therefore, the Court believes that the officers could have reasonably believed that Hubbard had authority to allow law enforcement to enter the residence. *Amratiel*, 622 F.3d at 916.

## VI. SUMMARY

The fighting issue here is whether Hubbard had actual or apparent authority to consent to a search of the residence. Defendant argues it was not reasonable for the officers to believe that Hubbard had common authority over the trailer, when she did not have keys to get inside, but had to crawl in through a window. Hubbard told the officers that she lived at the residence, and described in detail her efforts to retrieve her belongings. The officers knew that Hubbard had an altercation with Defendant at the residence the night before, and had just been assaulted by Defendant. While Hubbard did not have a key to the residence, she knew that the window near the front door was left unlocked. Under these circumstances, the officers had enough information at the time of the entry to reasonably conclude that Hubbard had authority to consent. Accordingly, the Court concludes that the Defendant's motion to suppress is without merit.

## VII. RECOMMENDATION

For the reasons set forth above, it is respectfully recommended that the Motion to Suppress (docket number 18) filed by Defendant be **DENIED**.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report*

*and Recommendation, they must promptly order a transcript of the hearing held on*
*January 12, 2012.*

DATED this _20ᵘ_ day of January, 2012.

_____
JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA