IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> RANDALL SHADY, <br><br> Defendant. | No. 11-CR-1010-CJW-MAR <br><br> **MEMORANDUM OPINION AND ORDER** |

## I.   INTRODUCTION

This matter is before the Court on defendant's Motion for Compassionate Release filed on June 12, 2020. (Doc. 79).[1] On June 17, 2020, the government timely filed a brief in resistance. (Doc. 80). Oral argument was not requested and is not necessary. *See* LR 7(c). For the following reasons, the Court **denies** defendant's motion.

## II.   RELEVANT BACKGROUND

On September 1, 2011, officers responded to a domestic disturbance at defendant's trailer. (Doc. 58, at 6). Officers found defendant's girlfriend A.H. waiting outside the trailer, who informed them that defendant had "punched her in the face." (*Id.*). Officers arrested defendant and entered the trailer to help A.H. remove her belongings. (*Id.*). While inside, officers observed items used to manufacture methamphetamine in plain view. (*Id.*). A.H. admitted to officers that defendant manufactured methamphetamine and that she helped him do so. (*Id.*). Officers seized from defendant's trailer, among other things, "sludge, solvents, sulfuric acid, lye, cold packs, HCl generators, lithium

---

[1] Defendant received an extension and thus his motion is timely. (Docs. 75, 77, & 78).

batteries, camp fuel, jars, tubing, plastic bottles, coffee filters, pseudoephedrine pills, and pseudoephedrine packaging, including boxes and empty blister packs." (*Id.*, at 7). Defendant's trailer was within 1,000 feet of a playground. (*Id.*).

On December 6, 2011, a grand jury issued an Indictment charging defendant with one count of conspiracy to manufacture methamphetamine in violation of Title 21, United States Code, Sections 846, 841(a)(1) ("Count 1"), and 841(b)(1)(B) and one count of possession of pseudoephedrine in violation of Title 21, United States Code, Section 841(c)(2) ("Count 2"). (Doc. 2). On December 15, 2011, officers arrested defendant. (Doc. 12). That same day, defendant appeared before the Honorable Jon S. Scoles, United States Magistrate Judge, pleaded not guilty, and was detained pending trial. (Doc. 9). On January 4, 2012, Judge Scoles released defendant pending trial. (Doc. 22).

On January 9, 2012, defendant's sister called officers to report that someone had been inside defendant's trailer, which was supposed to be unoccupied. (Doc. 58, at 7). Inside the trailer, officers found items used to manufacture methamphetamine, including "two empty Sudafed pseudoephedrine boxes and blister packs, an empty Coleman fuel can, coffee filters, and lithium batteries" along with "sludge and white reside" which are byproducts of manufacturing methamphetamine. (*Id.*). Surveillance video, a receipt, and other physical evidence showed defendant acquired these items from a Wal-Mart across two transactions on January 6, 2012, and January 8, 2012, respectively. (*Id.*, at 7–8). On January 10, 2012, officers arrested defendant again. (*Id.*, at 8).[2]

On February 8, 2012, the government filed an Information charging defendant with one count of manufacturing and attempting to manufacture methamphetamine in violation of Title 21, United States Code, Sections 846 and 841(a)(1). (Doc. 44). That same day, defendant waived indictment. (Doc. 45). On February 13, 2012, defendant

---

[2] The arrest warrant states defendant was arrested on January 12, 2011. (Doc. 37).

2

was arraigned on the Information and pleaded guilty to Count 2 of the Indictment and to the charge in the Information. (Doc. 50). On February 28, 2012, the Court accepted defendant's guilty plea. (Doc. 54).

On June 22, 2012, the United States Probation Officer ("USPO") filed defendant's final presentence investigation report ("PSR"). (Doc. 58). Defendant, at that time, was 32 years old and residing in Iowa, where he was also born. (*Id.*, at 3, 14). Defendant graduated high school. (*Id.*, at 3). Defendant stated he had a "good upbringing." (*Id.*, at 13). Defendant had two children from a prior marriage, which he reported ended due to his former wife's severe mental health issues. (*Id.*, at 14). Following his divorce in 2008, defendant had custody of his children until his former wife reported defendant for manufacturing methamphetamine in 2010. (*Id.*). As a result, defendant's children were placed in defendant's mother's custody. (*Id.*). Defendant had some work history but had been unemployed since 2009. (*Id.*, at 16–17). Defendant reported suffering from "chronic pain, brain damage, memory loss, and" an improperly healed eye socket. (*Id.*, at 14). The latter condition arose in 2006 when defendant was the victim of an assault, at which time he was suffering from "front pneumocephalus, front, nasal, ethmoid, and cribriform plate fractures." (*Id.*). Defendant spent one day in the hospital for these injuries and later underwent an elective surgery during his recovery. (*Id.*). Defendant was denied Social Security benefits for these conditions three times. (*Id.*). Defendant was diagnosed with bipolar disorder and anxiety. (*Id.*). Defendant's history of drug abuse—including marijuana, methamphetamine, cocaine, heroin, and prescription drugs—was substantial with defendant using many different substances on and off for years, often daily or weekly. (*Id.*, at 15). Defendant entered but failed to complete multiple drug treatment programs from 2010 to 2011. (*Id.*, at 16). Defendant's criminal history began at age 30 with offenses including theft, two domestic abuse assaults, and violation of a protective order. (*Id.*, at 10–11).

On July 31, 2012, the Court sentenced defendant. (Doc. 63). The Court determined defendant was in criminal history category III and had a total offense level of 34, yielding an advisory guideline range of imprisonment of 188 to 235 months followed by six years to life on supervised release. (Doc. 58, at 19–20). Defendant moved for a downward variance based on his addiction, mental health, and 2006 head injuries. (Doc. 61). The Court denied defendant's motion and sentenced him to 188 months' imprisonment—57 months on the Information and 131 months on Count 2 of the Indictment to run consecutively—followed by six years on supervised release. (Doc. 64). On March 5, 2015, the Court, on its own motion under Title 18, United States Code, Section 3582(c)(2), reduced defendant's sentence to 39 months on the Information and 112 months on Count 2 of the Indictment, for a total consecutive sentence of 151 months' imprisonment due to Guideline Amendment 782. (Doc. 68). Defendant is currently incarcerated at FCI Milan. (Doc. 79-1, at 2).

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a

> determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

The starting point in determining what constitutes "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i) is the United States Sentencing Guidelines ("USSG") discussing compassionate release issued by the United States Sentencing Commission. *See* USSG §1B1.13; *see also United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). USSG Section 1B1.13 provides extraordinary and compelling reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physically or mentally deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; (5) some other extraordinary and compelling reason as determined by the Director of the BOP.

Courts are split on whether the policy statement is binding because it predates the First Step Act of 2018's changes to Section 3582(c)(1)(A). *Compare United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019), *with United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019). This Court has concluded USSG Section 1B1.13, although it is a helpful guidepost, does

5

Case 2:11-cr-01010-CJW-MAR   Document 81   Filed 06/25/20   Page 5 of 11

not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See United States v. Burnside*, No. 6:18-CR-2068-CJW-MAR, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (compiling cases).

### IV. DISCUSSION

#### A. *Exhaustion of Administrative Remedies*

Section 3582(c)(1)(A) states the court may reduce a defendant's term of imprisonment after the defendant exhausts all their administrative remedies within the BOP or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" There is no dispute a defendant fulfills the exhaustion requirement when the defendant does not receive a response from the warden within 30 days of submitting their request. *See, e.g., United States v. McCloud*, No. 2:08-cr-00022, 2020 WL 3066618, at *2–3 (D.N.D. June 9, 2020) (finding exhaustion fulfilled due to the lapse of 30 days from the warden's receipt of the defendant's request even when the warden later denied the request); *United States v. Harper*, No. 7:18-cr-00025, 2020 WL 2046381, at *2 (W.D. Va. Apr. 28, 2020) (finding exhaustion fulfilled due to the lapse of 30 days).

Here, defendant submitted his request for release to FCI Milan's warden on May 11 or 13, 2020. (Docs. 79–1, at 2; 79–6). It appears defendant never received a response from the warden. On June 12, 2020, defendant filed his Motion for Compassionate Release now before the Court. (Doc. 79). At a minimum, 30 days elapsed between the time defendant submitted his request to the warden and the time defendant filed his motion here. Thus, the Court finds defendant has fulfilled the exhaustion requirement of Section 3582(c)(1)(A) due to the lapse of 30 days.

#### B. *Extraordinary and Compelling Reason*

Defendant argues an extraordinary and compelling reason for release is present because his medical conditions put him at a high risk of severe complications and death

6

if exposed to COVID-19. (Doc. 79–1, at 6–11). Specifically, defendant cites his medical conditions of hepatitis B, cirrhosis,[3] and a seizure disorder. (*Id.*, at 8). The government argues these conditions are insufficient. (Doc. 80, at 10–14).

Defendant offers the opinion of Dr. Antoine Trammell, an assistant professor of medicine at Emory University School of Medicine with a secondary appointment at Mercer University School of Medicine. (Doc. 79–1, at 6–9) (citing Docs. 79–4 & 79–5). Dr. Trammell, in his June 11, 2020 report, states defendant is in "grade 3" of cirrhosis, indicating "moderate liver damage." (Doc. 79–4, at 1). Dr. Trammell also notes defendant suffers from seizures,[4] advanced arthritis in both knees, an enlarged prostate, hemorrhoids, and chronic heartburn. (*Id.*, at 1–2) (summarizing defendant's health conditions). Dr. Trammell opines defendant's liver degradation makes defendant immunocompromised and that, because "respiratory infections with coronaviruses can be associated with neurological problems," defendant's seizures also increase his risk if exposed to COVID-19. (*Id.*, at 4).

Numerous courts have held a defendant's relevant health conditions and the presence of COVID-19 within the BOP generally, or within the defendant's specific facility, together can constitute an extraordinary and compelling reason for compassionate release. *See Burnside*, 2020 WL 3443944, at *7 (compiling cases). The Centers for

---

[3] Hepatitis B is a liver infection which can be short or long-term. *Hepatitis B*, CDC, https://www.cdc.gov/hepatitis/hbv/index.htm. "Chronic hepatitis B can lead to serious health issues, like cirrhosis or liver cancer." *Id.* "Cirrhosis is a late stage of scarring (fibrosis) of the liver" caused by liver damage which "generally can't be undone." *Cirrhosis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/cirrhosis-/symptoms-causes/syc-20351487

[4] Dr. Trammell states defendant suffered brain trauma in 2011. (Doc. 79–4, at 1–2). The only brain or head trauma referred to in the record occurred in 2006. (Doc. 79–2, at 13). Dr. Trammell also states defendant had a documented seizure in 2020. (Doc. 79–4, at 1). The record, albeit in late January 2020, reflects defendant's most recent seizure occurred in summer 2019. (Doc. 79–4, at 13, 16). Medical records up through April 30, 2020, do not mention any seizures in 2020. (Doc. 79–2, at 1).

Disease Control ("CDC") lists nine categories of people who are at higher risk of severe illness and death from COVID-19: (1) people 65 years or older, (2) people living in a long-term care facility, (3) people with chronic lung disease or moderate to severe asthma, (4) people with a serious heart condition, (5) people with a compromised immune system, (6) severely obese people with a body mass index ("BMI") of 40 or above, (7) diabetic people, (8) people with chronic kidney disease undergoing dialysis, and (9) people with liver disease. *People Who Are at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. The latter seven categories apply to "[p]eople of all ages with underlying conditions, particularly if not well controlled[.]" *Id.*

Defendant certainly fits the CDC's risk category of people with a liver disease and may also loosely fit the category for immunocompromised persons. The record shows defendant's liver disease is moderate and well-treated. (Doc. 79–2, at 1) (noting "remission of the liver disease"); (*Id.*, at 13, 15, 16) (noting defendant will receive liver ultrasounds every six months); (Doc. 79–3, at 3) (noting defendant receives medication for hepatitis B with no adverse side effects); (Doc. 79–4, at 1) ("[Defendant] is documented to have . . . moderate liver damage."). Defendant's seizures appear to be in substantial decline. (Doc. 79–3, at 3) (noting defendant's last seizure occurred in the summer of 2019 but that in 2011 defendant was having five seizures a week). The record also overwhelmingly shows defendant receives sufficient medications for his conditions. *See, e.g.*, (Doc. 79–2, at 2) (noting defendant takes chronic pain medication); (*Id.*, at 13) (noting defendant's medications for hepatitis B, seizures, and more). Indeed, the damage to defendant's liver cannot be undone, but it appears it is being controlled. Moreover, although defendant experiences chronic pain ranging from "3 to 8/10," his limitations are moderate, and he receives adequate treatment. (Doc. 79–2, at 10). Nothing in the record suggests defendant's immune system is compromised or that he has any respiratory

8

difficulties. *See* (Doc. 79–2, at 13) (noting defendant's respiratory rate was 16);[5] *see also* (Doc. 79–3, at 35) (containing the only instance where defendant complained of shortness of breath in September 2019). Defendant is also only 40 years old. (Doc. 58, at 3). Thus, the Court finds that although defendant has some significant health care needs, such needs place him at best at a marginally higher risk of serious complications should he be exposed to COVID-19.

The Court must also evaluate to what extent defendant is at risk of exposure to COVID-19 at his particular BOP facility or within the BOP generally. Currently, there are eight active cases of COVID-19, seven inmates and one staff, at FCI Milan. *COVID-19 Coronavirus*, BOP, https://www.bop.gov/coronavirus/. Many inmates and staff have recovered and approximately three inmates have died. *See* (Doc. 79–1, at 9). Although there is a considerable risk of exposure, the Court finds defendant's particular risk of serious complications is not elevated to such an extent that it constitutes an extraordinary and compelling reason for immediate release.

Thus, the Court finds defendant's medical conditions do not warrant release despite the COVID-19 pandemic.

### C. *Section 3553(a) Factors and Danger to Community*

Guideline Section 1B1.13(2) provides compassionate release is appropriate only where "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Title 18, United States Code, Section 3553(a)

---

[5] "Normal respiration rates for an adult person at rest range from 12 to 16 breaths per minute." *Vital Signs (Body Temperature, Pulse Rate, Respiration Rate, Blood Pressure)*, John Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/vital-signs-body-temperature-pulse-rate-respiration-rate-blood-pressure#:~:text=Respiration%20rates%20may%20increase%20with,to%2016%20breaths%20per%20minute.

before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

Defendant's underlying offense is highly aggravating. Defendant was arrested and federally indicted for manufacturing methamphetamine. While out on pretrial release for that offense, defendant immediately returned to the exact same criminal conduct. Defendant did this despite losing custody of his children in 2010 due to a report he was manufacturing methamphetamine at that time. Defendant rejected and failed to complete multiple drug treatment programs. The instant offense and defendant's criminal history both indicate a pattern of violence against domestic partners. This offense, and defendant's violation of a prior protective order, shows he has no respect for the law. Prior to his offense, defendant was unemployed for two years. Defendant's substance abuse history, although lengthy and multifaceted, shows he was capable of controlling his addiction at times. Nothing in defendant's upbringing mitigates his decision to involve himself in drugs. Although the Court acknowledges this is defendant's first lengthy term of incarceration and that he has a release plan, the aggravating factors are overwhelming.

As of this writing, defendant has served approximately 102 months of his 151-month term of imprisonment. The Court finds that neither defendant's health conditions nor the circumstances of his offense weigh in favor of reducing his sentence by nearly a third. The Court finds the remainder of defendant's term of incarceration is necessary to deter this defendant and others similarly situated as well as to provide just punishment.

Weighing all the factors under Section 3553(a), the Court finds compassionate release is inappropriate and therefore denies defendant's motion.

## V. CONCLUSION

For these reasons, defendant's Motion for Compassionate Release (Doc. 79) is **denied**. Defendant must serve the remainder of his term of imprisonment as previously directed. (Docs. 64 & 68).

**IT IS SO ORDERED** this 25th day of June, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa